FILED

JUL 0 9 2012

United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ] Case No. 10-53496-ASW |
| RODOLFO ZAMORA AND MARIA ZAMORA, | ] Chapter 7 |
| Debtors. | ] |

### MEMORANDUM DECISION FOLLOWING EVIDENTIARY HEARING

Before the Court are the objections of Debtors Rodolfo and Maria Zamora ("Debtors") to two proofs of claim filed by Creditor Gerald Morris ("Morris"). Morris seeks to collect interest on an $82,000 note signed on September 5, 2006, and payment for an $84,799.98 note signed by Debtor Rodolfo Zamora ("Rodolfo Zamora" or "Zamora") on January 29, 2008. Both notes were secured by deeds of trust on Debtors' office building located at 821 E. Lake Avenue, Watsonville, California ("Property"). Debtors argue that Debtors owe no interest on the $82,000 note and never received any of the money represented by the $84,799.98 note.

Morris is represented by Brian M. Kandel, Esq. of Book & Book, LLP. Debtors are represented by Judson T. Farley, Esq., Attorney at Law.

MEMORANDUM DECISION FOLLOWING
EVIDENTIARY HEARING

An evidentiary hearing was held. The parties subsequently submitted written closing arguments and the matter has been submitted for decision. At the evidentiary hearing, Morris called Deborah Howey, an officer of First American Title Company, and Morris as witnesses. Debtors called Debtors as witnesses. On October 11, 2011, upon a motion filed by the United States Trustee that Debtors did not oppose, the case was converted from a Chapter 11 to a Chapter 7. Since the Chapter 7 Trustee, Marc Del Piero, was representative of the estate, but was not a party to the trial, the Court issued an "Order Requesting Parties' Positions" on March 27, 2012, asking whether the Chapter 7 Trustee consented to be bound by the findings in the Memorandum Decision. On April 6, 2012, the Chapter 7 Trustee filed a "Response to Court Order," stating that he had reviewed Morris's claims and consented to being bound by the Court's decision based on the current record.

Accordingly, the Court goes forward with this Memorandum Decision. This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.

FACTS

Debtors filed for Chapter 11 bankruptcy on April 5, 2010. On May 17, 2010, Morris filed two proofs of claim. One proof of claim was in the amount of $20,487.39, representing the interest allegedly owed on the $82,000 note, secured by a second deed of trust on the Property. The other proof of claim was in the amount of $98,469.29, allegedly representing the $84,799.98 note and

accumulated interest, secured by a third deed of trust on the Property.  On July 7, 2010, Morris also filed two motions for relief from automatic stay under Bankruptcy Code section 362(d)(2) -- one related to the $82,000 note and deed of trust, and the other related to the $84,799.98 note and deed of trust.  Debtors opposed both motions for relief from stay, asserting that Morris had waived interest due on the $82,000 note at the time the principal was paid and that Debtors did not owe any amounts under the $84,799.98 note.

At a hearing on the two motions for relief from stay, this Court and counsel for both parties agreed that the issues relating to Debtors' liability on the two notes should be determined at an evidentiary hearing on Debtors' objections to Morris's proofs of claim, rather in a relief from automatic stay proceeding.  Morris's counsel filed a request for an evidentiary hearing based on Debtors' objections to the two proofs of claim.  Morris's motions for relief from stay trail this evidentiary hearing.

### A. Morris and Debtors' Early History

Morris has been a licensed loan broker since 1990, and has been doing business since 1988 under the name Capital Financial. Morris and Zamora first met in 1993, after Zamora purchased property from one of Morris's clients.  In 2001, Zamora decided to obtain a real estate license after hurting his back at his previous job as supervisor for a strawberry cooler.  In 2002, Morris hired Zamora as a licensed real estate agent for Morris's company, Central Coast Realty.  Zamora was successful at his work, earning $46,000 his first year, $85,000 his second year, $150,000 his third year, and $200,000 his fourth year.  During this time, Zamora

switched from working as a real estate agent to working as a loan officer.  Morris and Peggy Youmans, the office manager, were the only two licensed loan brokers for Central Coast Realty.  In 2005, Morris no longer wanted to own a real estate business and offered to sell Central Coast Realty to Zamora, thinking that owning the business would be a good opportunity for Zamora.  Zamora purchased the business for $31,400 from Morris in January 2006.  In July 2006, Zamora also purchased the Property for $585,000 from Candace Johnson ("Johnson").  Zamora granted Johnson a first deed of trust on the Property in the amount of $135,000.

Morris testified that Morris agreed to remain as the loan broker for Central Coast Realty throughout 2006, until Zamora obtained his own loan broker's license or found another experienced loan broker.[1]  Morris estimated that Morris worked four to five hours per month from Morris's home office at 421 Hill Avenue, for approximately $10,000 per year gross.  Morris claimed that Morris reminded Zamora several times throughout the year that Morris's status as the licensed loan broker was temporary.  Yet while Zamora purchased six or seven courses, Zamora never took the exam to become a licensed loan broker.

B.  **Antonio Maldonado**

In October 2005, a few months before Morris sold Central Coast Realty to Zamora, Antonio Maldonado ("Maldonado") visited the office to request a $20,000 loan for Maldonado's fruit stand.

---

[1] Under this arrangement, Morris received 10 percent of each of Zamora's transactions, $500 for each of the real estate agents' transactions, and $250 for each transaction involving a mobile home.

MEMORANDUM DECISION FOLLOWING
EVIDENTIARY HEARING

Morris and Zamora dispute the details of Zamora's connection to Maldonado. Morris testified that Maldonado was the best friend of Zamora's brother, Jesus. Morris "didn't have a good feeling" about Maldonado, but decided to lend Maldonado the $20,000 after Zamora stated that Jesus would guarantee the loan. Morris testified that Morris did not know how Maldonado used the $20,000 loan, except that Maldonado used part of the loan to repay Zamora $6,599.67 for a loan Zamora had made to Maldonado in 1980. In direct contradiction of Morris's testimony, Zamora testified that he never made any prior loans to Maldonado and had never even met Maldonado before Maldonado came to Central Coast Realty. Instead, it was Morris who had the relationship with Maldonado.

Morris ran a credit report on Maldonado's residence, 10690 Blevins Way ("Blevins"), and was convinced there was enough equity in Blevins to make a $20,000 loan. Morris secured the $20,000 loan with a second deed of trust on Blevins in October 2005. The first deed of trust on Blevins was held by Option One Mortgage ("Option One") for $425,000.

Morris testified that Maldonado made one $200 payment on the $20,000 loan and Zamora another, before Maldonado returned to the office requesting additional funds in January 2006. Zamora disputes this, claiming that three to four payments were made on the $20,000 loan before the additional funds were loaned to Maldonado. Morris claimed that he refused to loan more money to Maldonado because Maldonado was already having trouble making payments on the $20,000 loan. Zamora therefore made a personal loan to Maldonado for $30,000, in return for a third deed of trust on Blevins recorded on February 6, 2006. Zamora claimed that he

borrowed the $30,000 on his personal credit line only so that he could charge interest and make a profit. Zamora testified that Maldonado would be able to sell Blevins and repay Zamora out of the sale proceeds.

### C. $75,000 Loan to Maldonado and the $82,000 Note

In February 2006, Maldonado and his wife were trying to purchase a mobile home at Moss Landing, California ("Moss Landing"). Morris testified that because Morris did not want to lend Maldonado money directly, Morris arranged for Maldonado to receive a $140,000 loan from one of Morris's investors, Elizabeth Mountford ("Mountford"). Maldonado still needed $70,910.44 to close escrow, so Maldonado applied to Central Coast Realty for another loan.

Morris testified that Debtors wanted to help Maldonado secure Moss Landing. While Morris did not trust Maldonado, Morris trusted Debtors. Morris therefore made an $82,000 loan directly to Debtors. Debtors, in turn, made a $75,000 loan to Maldonado to purchase Moss Landing. As security for the $75,000 loan, Debtors took out another deed of trust on Blevins, the fourth overall.[2]

Zamora testified that Morris made the $82,000 loan not for Debtors' benefit, but because Morris saw an opportunity to earn money from the sale of Blevins. Morris chose to not put the loan

---

[2] The deed of trust was listed in Maria Zamora's name. From the testimony at the hearing, it appears that although Maria Zamora earned her real estate license in 2004 and was employed by Central Coast Realty, Maria Zamora spent most of her time working at Debtors' jewelry store. Maria Zamora had little interaction with Morris and little involvement in the loan-making decisions compared to Rodolfo Zamora.

in Morris's name because Morris did not want to make a 100 percent hard-money loan, believing it was too risky for Morris's investors. Therefore, Morris loaned $82,000 to Zamora solely for the purpose of Zamora lending money to Maldonado.

Nonetheless, both Debtors signed the $82,000 note on September 5, 2006. The $82,000 note provided for an interest rate of 12 percent and a due date of July 1, 2007. The $82,000 note was secured by a second deed of trust on the Property. Morris stated that Morris waited several months after the oral agreement with Zamora to put the agreement into writing because Zamora was Morris's friend whom Morris trusted to honor the agreement.

Maldonado soon failed to make payments on the loan secured by the Moss Landing property. Because Debtors held a fourth priority lien on Blevins for $75,000, Maldonado finally transferred control of Blevins to Debtors through a grant deed on June 8, 2006. Morris testified that Maldonado was already trying to sell Blevins, but both Morris and Zamora believed that Zamora would take more aggressive action to sell Blevins.[3] Morris believed that if Zamora controlled Blevins, Zamora could set the sale price. On August 6, 2006, Zamora set the list price for Blevins at $635,000. That same month, Maldonado became delinquent on payments owed to the senior

---

[3] The concern was that if Maldonado had already received as much equity as he could out of Blevins, he had no need or desire to sell the property quickly. He might wait until a better offer came along, while Debtors, as lien holders, would continue not to receive payments and would have a greater incentive to sell Blevins quickly.

MEMORANDUM DECISION FOLLOWING
EVIDENTIARY HEARING

deed of trust on Blevins held by Option One. In September 2006, Option One recorded a notice of default on Blevins.[4]

Morris testified that Zamora intended to cure the Notice of Default. During this time, in August and September 2006, Morris made four loans to Zamora in the amounts of $5,000, $5,000, $10,000, and $5,000 respectively. The loan for $10,000 was an advance on a $120,000 loan that Morris made to Debtors for Debtors' personal use, and which Debtors secured with a mortgage on Debtors' Elkhorn Road rental property in Watsonville ("Elkhorn").

Blevins remained unsold. Morris testified that Morris advised Zamora several times to reduce the price because the real estate bubble was about to burst. Morris testified that Morris was no longer focused primarily upon recouping on Morris's $20,000 investment. Specifically, Morris testified: "I did not have a good feeling about where the market was and I felt that if I walked away from $20,000, so be it."[5] By this time, Morris had sold the $20,000 loan to Morris's friend's parents, the Phillips, and was making the $200 monthly payments himself.[6]

On October 13, 2006, Zamora finally lowered the listing price to $619,000. According to Morris, on November 2, 2006, Morris advanced another $10,000 to Debtors for Debtors' personal use. On November 27, 2006, Zamora lowered the listing price of Blevins again to $595,000.

---

[4] By the time of the Notice of Default in September 2006, the amount due to Option One was $431,000.

[5] This testimony was given on July 19, 2011 at 11:29:27 a.m.

[6] Morris would eventually pay off the entire $20,000 loan with $126 interest in February 2008.

MEMORANDUM DECISION FOLLOWING
EVIDENTIARY HEARING

Case: 10-53496   Doc# 266   Filed: 07/09/12   Entered: 07/09/12 15:45:34   Page 8 of 20

### D. Forbearance Agreement and Payments to Option One

On November 20, 2006, Maldonado reached a forbearance agreement with Option One. Morris and Zamora dispute who was involved in negotiating the agreement. Morris testified that Zamora and Maldonado negotiated the agreement. Morris said he had little involvement because Morris could not communicate with Maldonado, who spoke only Spanish. Zamora testified that it was Morris who arranged the forbearance agreement with Option One. The Court notes that both versions could be largely true. Zamora may have talked to Maldonado and Morris may have talked to Option One.

Option One agreed not to foreclose on Blevins as long as Option One received an initial payment of $13,000 by November 23, 2006, and monthly payments of $4,500 thereafter. Zamora made the initial payment of $13,000 from the $120,000 loan secured by Elkhorn. Zamora hoped this would give him more time to sell Blevins.

In early 2007, unable to make the payments on Moss Landing, Maldonado transferred title in Moss Landing to Debtors. By March 2007, Zamora was behind in payments to Option One, leading Option One to record a Notice of Trustee's Sale on March 6, 2007.

Morris and Zamora reached an agreement over how to proceed with Option One, but dispute the terms of the agreement. Morris testified that Zamora asked Morris to bring the amount owed to Option One current with a $24,724.86 payment. Morris testified that Morris was reluctant to invest more money to prevent the foreclosure of Blevins. Morris agreed to bring the payments current, and to continue to make payments until Blevins sold, but only if Zamora agreed to give Morris a note and deed of trust in

MEMORANDUM DECISION FOLLOWING
EVIDENTIARY HEARING

the Property -- in case Zamora was unable to sell Blevins. Morris testified that Zamora made an oral agreement to "pay back whatever [Morris] put into it," and Morris wired $24,724.86 to Option One on March 15, 2007. Over the next several months, Morris would make additional payments to Option One in the total amount of $30,819.27.

By contrast, Zamora testified that Zamora and Morris had an agreement that both would advance payments to Option One so that Zamora and Morris could each protect his own respective investment: Zamora would make payments to protect his $30,000 and $75,000 loans, and Morris's $55,544.13 in total payments were made to protect his $20,000 loan.

Morris testified that in accordance with his version of the agreement with Zamora, Morris made the additional $30,819.27 in payments to Option One as follows: on June 7, 2007 for $9,896.13; on August 10, 2007 for $6,974.38; on October 9, 2007 for $6,974.38; and on December 5, 2007 for $6,974.38. When asked why Morris's payments were higher than the $4,500 monthly payment, Morris could not recall the reason, except that he said he paid the amounts Zamora asked him to pay.

**E.  $82,000 Note Comes Due**

On July 1, 2007, the $82,000 note came due. Morris testified that interest had been established at 12 percent per month because Morris believed that Debtors charged Maldonado 12 percent interest[7] for the $75,000 loan, although Morris admitted later that Debtors

---
[7] Morris testified that for private money loans at that time, the standard annual interest rate was between 11 and 13 percent.

MEMORANDUM DECISION FOLLOWING
EVIDENTIARY HEARING

never received 12 percent interest. Morris had borrowed $82,000 from Morris's personal line of credit to fund the $82,000 note and paid interest on the personal credit line at an annual rate of 7.25 percent.

When Zamora had made no payments on the $82,000 note, Morris sent a standard form demand letter to Debtors on October 30, 2007. The demand letter made no mention of the interest owed on the $82,000 note. Morris testified that Morris did not mention the interest because Morris was trying to persuade the Debtors to refinance the Property. According to Morris, if Debtors had refinanced the Property, Debtors would have had to pay the interest owed on the $82,000 note.

Morris testified that in December 2007, Zamora told Morris to stop advancing payments to Option One because there was no more equity in Blevins. Option One was now free to foreclose on Blevins. Zamora lowered the price of Blevins one last time, to $525,000 on March 14, 2008.[8]

### F. Zamora Signs the $84,799.98 Note

On January 29, 2008, Zamora signed a promissory note for $84,799.98[9] that would be due and payable on January 29, 2009. The $84,799.98 note was secured by a third deed of trust on the Property. Morris testified that Morris's agreement with Zamora was

---

[8] The Court notes that when Option One foreclosed on June 27, 2008, the amount due to Option One was $453,247.86.

[9] The $84,799.98 figure consisted of: (1) the $20,000 Morris loaned to Maldonado with back interest; (2) the $24,724.86 wired to Option One; (3) the $30,819.27 in other advances to Option One; plus (4) foreclosure fees (because Morris had begun foreclosure proceedings) minus $1,000.

MEMORANDUM DECISION FOLLOWING
EVIDENTIARY HEARING

based on the following: (1) Morris's agreement to forbear from foreclosing on his junior lien on Blevins;[10] (2) Morris's advances to Option One for the purpose of protecting Zamora's $30,000 and $75,000 investments; and (3) Morris's agreement to offer a below-market rate of 6 percent for the $84,799.98 note, rather than the customary rate of 12 percent between January 29, 2008 and January 29, 2009, as well as to give Zamora additional time to repay the advances and guaranteed debt. At the time the alleged agreement was made, the note was unsecured.[11] The note would not become secured until Zamora signed the $84,799.98 note and deed of trust. Zamora signed the $84,799.98 note at the Santa Cruz Title Company in the office of notary Marie Coffee while Morris was not present. Coffee prepared the $84,799.98 note and deed of trust and had evidence of Zamora's signature in the notary book. Zamora testified that Maria Zamora did not want to sign the $84,799.98 note, so the $84,799.98 note bore only Rodolfo Zamora's signature. Maria Zamora testified at the hearing that Rodolfo Zamora did not tell her about the $84,799.98 note and deed of trust until 2011.

Zamora testified that because Zamora thought that Morris paid the advances to Option One to protect Morris's own investment,

---

[10] Morris had already recorded a notice of default on the $20,000 loan secured by Blevins on August 23, 2007.

[11] Morris testified as follows in response to questions by the Court. The Court asked: "Why, in your opinion, should Zamora sign a note and deed of trust on what essentially was a completely unsecured loan?" Morris responded: "Because he had agreed to do it." July 19, 2011 at 11:38:44 a.m. Later, Morris stated: "I had told [Zamora] when I started this, when I gave him the $24,000, that when we got done making these payments, I wanted a note and a deed of trust against E. Lake Avenue." July 19, 2011 at 11:39:32 a.m. In response to the Court's question as to the timing of the statement, Morris testified: "Before I made the $24,000 payment." July 19, 2011 at 11:39:50 a.m.

MEMORANDUM DECISION FOLLOWING EVIDENTIARY HEARING

12

Zamora was surprised when Morris presented Zamora with the $84,799.98 note in January 2008. Zamora testified that Morris told Zamora: "If you don't sign this note, you won't have a broker tomorrow." Zamora had once tried to find another licensed loan broker, but was unsuccessful. Zamora believed that he would lose a substantial amount of business if Zamora did not have a licensed loan broker for Central Coast Realty. Zamora also looked up to Morris as a long-time mentor and friend, which put added pressure on Zamora to submit to Morris's wishes. Zamora therefore signed the $84,799.98 note.[12]

### G. Zamora Pays $82,000 Without Interest

On June 16, 2008, Zamora paid the principal on the $82,000 note out of the proceeds of a sale of property located on Mount Madonna Road that Zamora owned jointly with Zamora's father-in-law. Morris testified that when he received the $82,000 at his home office, Morris asked Zamora: "Where's the interest?" Zamora allegedly smiled and went about Zamora's business. By this time, the interest on the $82,000 loan was more than $18,000. While Morris admits that he did not pressure Zamora as often as Morris might have -- aware of Debtors' money problems as a result of the Maldonado loans -- Morris never had an incentive to waive the 12 percent interest when Morris was still paying 7.25 percent interest

---

[12] In Zamora's August 2010 declaration, Zamora claimed that his signature had been forged on the $84,799.98 note and deed of trust. When asked to account for the discrepancy between Zamora's declaration and his later statements that Morris coerced Zamora into signing the $84,799.98 note, Zamora testified that Maria Zamora did not know Zamora had signed the note and deed of trust and Zamora did not want Maria to find out.

MEMORANDUM DECISION FOLLOWING
EVIDENTIARY HEARING

on the money Morris borrowed to fund the $82,000 note.

Both Rodolfo and Maria Zamora, however, testified that Morris expressly waived interest on the $82,000 note. Both testified that, after an office meeting, Morris took Debtors aside and told Debtors to forget the interest; Morris was only interested in the principal. Zamora could not recall the date of the meeting, but estimated that the meeting took place two months before Zamora paid Morris $82,000. Morris's statement was never put into writing. However, Zamora relied upon Morris's statement and paid just the principal on the $82,000 note.

### H. Foreclosure Proceedings

On June 27, 2008, Option One completed foreclosure of Blevins, leaving Morris and Debtors as "sold out" junior lienholders. Seven months later, on January 29, 2009, the $84,799.98 note came due. On January 23, 2009, Morris gave 30 days notice that Morris would resign as broker for Central Coast Realty; however, Morris did not actually disassociate from Central Coast Realty until August 2009.

On September 22, 2009, Morris's counsel at the time, Salvator Bacile, sent a demand letter to Zamora stating that the $84,799.98 note was past due. Morris knew that Johnson, the senior deed of trust holder for the Property, had recently sent Zamora a notice of default. Soon after, Zamora came to Morris's home office in a state of agitation, claiming that Zamora did not owe Morris "the money" because Zamora had never received the money for the $84,799.98 note.

On November 10, 2009, Morris initiated foreclosure proceedings on both the $82,000 note and deed of trust, due to the unpaid

MEMORANDUM DECISION FOLLOWING
EVIDENTIARY HEARING
14

interest, and the $84,799.98 note and deed of trust. Both notes were secured by the Property. On March 5, 2010, Morris recorded a notice of sale on the Property. Zamora did not recall receiving Morris's notice of default and was therefore stunned to learn about the notice of sale.

Deborah Howey, an officer of First American Title Company, testified that Morris wanted to foreclose on the Property after Zamora failed to pay interest on the $82,000 note and also when Zamora failed to pay Morris the full amount on the $84,799.98 note. Howey affirmed that Zamora paid a visit to Howey's office in April 2010 after learning that the Property was set for foreclosure, but could not recall of which foreclosure Howey and Zamora spoke. Zamora was upset about the notice of sale, claiming that Zamora never received a loan from Morris, had not borrowed any money, and did not think Zamora had signed any documentation to that effect. Howey could not recall Zamora mentioning that Zamora had signed a note under threat. According to Howey, when Howey showed Zamora his signature on the $84,799.98 note, Zamora responded that the signature was Zamora's, but Zamora did not sign the $84,799.98 note. Zamora never demanded to see the original deed of trust, but did want to know where the $84,799.98 note was located.

Debtors filed for Chapter 11 bankruptcy on April 5, 2010.

### III.

### LEGAL STANDARD

Under Federal Rule of Bankruptcy Procedure 3001, a proof of claim is "a written statement setting forth a creditor's claim" that is executed by the creditor or creditor's authorized agent.

Fed. R. Bankr. P. 3001(a)-(b). Proofs of claim filed in accordance with Rule 3001 "shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f).

The presumption that a proof of claim is prima facie evidence of validity is rebuttable. In re Garner, 246 B.R. 617, 622 (B.A.P. 9th Cir. 2000). At a hearing on an objection to a proof of claim, the initial burden of going forward with the evidence is on the objecting party. In re Lipetzky, 66 B.R. 648, 649 (Bankr. D. Mont. 1986). The objector must provide sufficient evidence and "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." Lundell v. Anchor Const. Specialists, Inc., 223 F.3d 1035, 1039 (9th Cir. 2000) (quoting In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992)). If the objector fails to provide sufficient evidence, the objector has not met this burden. Id. On the other hand, if the objector sufficiently rebuts the presumption of validity, then the ultimate burden of proof is on the claimant. In re Garner, 246 B.R. at 622.

IV.

ANALYSIS

To determine whether Morris's proofs of claim are valid, this Court must consider three issues: (1) whether Morris waived the payment of interest on the $82,000 note; (2) whether Rodolfo Zamora signed the $84,799.98 note under duress, rendering the $84,799.98 note invalid; and (3) whether there was consideration for the deed of trust securing the $84,799.98 note.

## A. Waiver of Interest on the $82,000 Note

The first issue is whether Morris waived Morris's right to receive payment of interest on the $82,000 note. The 12 percent interest was stated in the $82,000 note when Debtors signed it, creating a legal obligation for Debtors to pay the interest. In order for Debtors to establish that Morris waived his right to receive interest, Debtors must prove that Morris made "a clear showing of intent to give up such a right." Pacific Valley Bank v. Schwenke, 189 Cal. App. 3d 134, 145 (1987). The burden is on Debtors who claim waiver, and this burden must be satisfied by "clear and convincing evidence that does not leave the matter to speculation." In re Marriage of Vomacka, 36 Cal. 3d 459, 469 (Cal. 1984). Waiver may be shown by express language, as well as "circumstances or a course of acts or conduct." Singh v. Cross, 60 Cal. App. 309, 317 (1922).

Debtors contend that Morris expressly waived Morris's right to receive interest. Debtors both testified that Morris took Debtors aside after an office meeting and told Debtors to forget the interest; Morris was only interested in receiving payment of the $82,000 principal. Rodolfo Zamora thought that this meeting took place two months before Zamora paid Morris the $82,000 on June 16, 2008. Morris testified that no such conversation took place. According to Morris, when Zamora brought Morris the $82,000 payment, Morris asked Zamora: "Where's the interest?" Morris testified that Morris was paying 7.25 percent interest for the $82,000 on Morris's line of credit, so Morris had no incentive to waive the 12 percent interest.

The Court finds that Debtors likely believed that Morris was waiving interest on the $82,000 note, but that any such belief was a result of a misunderstanding between the parties. Debtors have not met their burden of proving that Morris intended to waive interest permanently. The Court generally finds Morris's testimony to be credible on this issue. The Court can understand that Morris was pressing for the $82,000 and that Debtors had the definite impression that the $82,000 was all that Morris sought. The Court notes that Debtors have no documentation of the meeting where Morris allegedly waived the interest. Debtors' only evidence is Debtors' testimony. The meeting was never noted in writing; there were no other witnesses to confirm Morris's statements. Neither Rodolfo nor Maria Zamora could recall exactly when this meeting took place, with Rodolfo Zamora only able to narrow the date down to "a couple of months" before Zamora paid the $82,000 principal. Even if there were corroborating evidence of Morris's statement, there would still be the issue of Morris's intent: whether Morris meant to waive the interest for the time being or permanently. Regardless, without corroborating evidence, Debtors have not met the burden of "clear and convincing evidence" in establishing that Morris waived Morris's right to receive payment of interest. The Court finds that there was a misunderstanding between the parties on the issue.

With no corroborating evidence that Morris expressly waived this right, the next question is whether Morris implicitly waived this right through conduct. Debtors point to the fact that Morris's demand letter, sent on October 30, 2007, did not mention interest owed on the $82,000 note. Debtors also argue that between

June 16, 2008, the date Morris received the $82,000 principal and August 2009, when Morris began foreclosure proceedings on the Property, Morris never asked Debtors about interest or sent statements reminding Debtors that interest on the $82,000 note was still due. Debtors argue that Morris's conduct implied waiver.

Morris argues that it was not Morris's practice to send statements, especially for personal loans made to friends or family. Morris thought the $82,000 note, with its provision for interest, was sufficient to inform Debtors. At the same time, Morris testified that Morris did ask Rodolfo Zamora where the interest was when Zamora paid the $82,000 on June 16, 2008, and would ask Debtors periodically thereafter.

Waiver may be found where the "party's acts . . . are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." Oakland Raiders v. Oakland-Alameda County Coliseum, Inc., 144 Cal. App. 4th 1175, 1190 (2006) (quoting Waller v. Truck Ins. Exchange, Inc., 11 Cal. 4th 1, 31-33, 34 (Cal. 1995)). The issue is whether Morris's decisions not to send invoices and to wait until August 2009 to commence foreclosure proceedings amount to "clear and convincing evidence" that Morris waived Morris's right to receive interest through conduct. In Pacific States Corp. v. Hall, 166 F.2d 668, 671 (9th Cir. 1948), the Ninth Circuit found that just because Citizens Bank issued statements that made no mention of interest owed by the borrower did not mean that Citizens Bank's waived its right to receive the interest through conduct. The Court finds that Morris's failure to send invoices did not, by itself, constitute clear and convincing evidence of waiver in this

case. Debtors' evidence that Morris waived the interest due on the $82,000 note through conduct, while not insubstantial, does not meet the necessary "clear and convincing" standard. Here, Zamora offered no evidence challenging Morris's testimony that it was not his practice to send statements -- especially when dealing with family and friends. On the other hand, given the misunderstanding between the parties described earlier, the Court certainly understands why Morris's silence on the subject of interest may well have confirmed Debtors' belief that Morris had waived interest on the $82,000 note.

Finally, there is no evidence that Debtors materially changed Debtors' position as a result of Morris's alleged waiver. See Jones v. Sunset Oil Co., 118 Cal. App. 2d 668 (1953). When one party to a transaction induces another to act on the reasonable belief that the initial party has waived certain rights that the initial party is entitled to assert, the initial party will be estopped to insist on such rights to the prejudice of the one misled. Id. at 674.

Here, the only action that Debtors took that suggested reliance on Morris's alleged waiver was not paying interest on the $82,000 note. Without evidence that Debtors materially changed Debtors' position due to reliance on Morris's alleged waiver, Morris cannot be estopped from asserting Morris's right to receive interest on the $82,000 note. Therefore, Debtors have failed to prove by "clear and convincing evidence" that Morris waived Morris's right to receive interest, and the claim for interest is allowed.

The inquiry, however, does not end here. When a creditor

MEMORANDUM DECISION FOLLOWING
EVIDENTIARY HEARING

20